# In the United States Court of Federal Claims

No. 12-508C

(Filed: January 27, 2014)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * | | |
| CLAUDIA ASTRID HURTADO VARGAS, | * | |
| Plaintiff, | * | Motion to dismiss for failure to state a claim upon which relief can be granted; subject matter jurisdiction; breach of contract; confidential informant; RCFC 12(b)(6); 28 U.S.C. § 1491(a)(1) |
| v. | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * * * * * * * * * * * * | | |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

*Ignacio Javier Alvarez*, Alvarez Martinez Law Firm, LLC, Washington, DC, for plaintiff.

*John Sinclair Groat*, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**KAPLAN, Judge.**

This case is before the Court on the motion of the defendant, the United States of America (hereinafter "the government"), to dismiss for failure to state a claim upon which relief can be granted under Rules of the Court of Federal Claims ("RCFC") 12(b)(6). The plaintiff, Claudia Astrid Hurtado Vargas ("Hurtado"), a Colombian citizen, alleges that the government breached express and/or implied contracts it entered into with her to secure her services as a confidential informant in connection with criminal investigations that U.S. law enforcement authorities conducted in Colombia between 1998 and 2001. Specifically, Hurtado claims that the government violated its contractual obligation to provide her with protection and judicial assistance in exchange for her services, when it failed to timely and effectively notify the Colombian government of her status as a confidential informant for U.S. law enforcement. As a result of this breach, she claims, Colombian authorities subjected her to a criminal investigation, which resulted in her arrest, trial, conviction, and incarceration. Hurtado seeks $15 million in damages with interest and the costs of this suit.

The government has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The government's central argument is that Hurtado has not alleged sufficient facts to show that the government officials with whom she dealt had actual authority to

obligate the United States to provide her with the kind of protection and assistance she claims she was promised. Def.'s Mot. to Dismiss at 1. It contends that "the gravamen of the breach [Hurtado] alleges" is "the failure of the United States to intervene in foreign litigation," which "involves a matter committed by [28 U.S.C. § 516] exclusively to the discretion of the Attorney General." Id. Accordingly, the government argues that, as a matter of law, the officials with whom Hurtado allegedly contracted lacked the authority to bind the United States to act to protect her in connection with her investigation, prosecution, and incarceration by the Colombian government. Id. at 4.

For the reasons set forth below, the Court concludes that Hurtado has alleged sufficient facts to state a claim for breach of contract. Accordingly, the Court denies the government's motion to dismiss.

## BACKGROUND[1]

### A. The Alleged Agreement

Hurtado alleges that in 1997 and 1998, she entered written agreements with U.S. authorities to serve as a confidential informant in connection with two separate law enforcement investigations. Compl. ¶ 2. The first agreement, entered with the Internal Revenue Service in 1997, provided that Hurtado would serve as a confidential informant on an investigation of tax evasion operations by U.S. persons connected to Colombia. Compl. ¶ 6. In late 1998, after her work for the IRS ended, Hurtado entered a second written agreement, under which she served as a confidential informant for the United States Customs Service ("USCS"), in connection with the activities of the El Dorado Task Force. It is this agreement that gave rise to Hurtado's allegations of breach in this case.[2]

According to the complaint, the El Dorado Task Force was created in 1992 "to address the prolific money laundering threat in New York." Id. at ¶ 13. The Task Force was operated out of the USCS's Special Agent-in-Charge Office in New York; it targeted money laundering systems and financial crimes through undercover investigations, outbound operations, regulatory interventions, and other techniques. Id. at ¶ 13. By 2001, the Task Force was comprised of 185 individuals from 29 federal, state, and local agencies, including the FBI, the New York Police Department, and the New York State Banking Department. Id.

---

[1] The facts are derived from the complaint and are undisputed unless otherwise noted.

[2] Hurtado alleges that the government officials with whom she dealt did not provide her a copy of the 1998 agreement (or the 1997 Agreement for that matter). Compl. ¶¶ 8, 20. At this stage in the litigation, the government has neither conceded nor denied Hurtado's allegations that written agreements were executed in connection with her services as a confidential informant. The government has indicated, however, that it has thus far been unable to locate any written contract or agreement with the plaintiff and that it believes that "most related documents" were destroyed incident to the destruction of the World Trade Center on September 11, 2001. Def.'s Reply 2 n.1.

The 1998 agreement contemplated that Hurtado would perform acts in Colombia that would be considered criminal offenses there. Compl. ¶ 36. According to Hurtado, the government agreed to "protect [her] and provide her judicial assistance in relation to the activities that she would perform as a confidential informant." Id. at ¶ 16. Hurtado alleges that she entered the agreement with the understanding that she would have the "absolute protection and assistance of the United States in relation to her work, and that the Colombian government was fully informed and aware of operations with confidential informants" in Colombia. Id. at ¶ 18.

B. **Hurtado's performance under the contract**

In accordance with the 1998 written agreement, Hurtado served as a confidential informant supporting the work of the El Dorado Task Force from 1998 to 2000. Compl. ¶ 22. She alleges that she performed her work under the direction of agents with the Task Force, with the consent and approval of the United States Attorney's Office for the Eastern District of New York. Id. at ¶ 24.

As part of her services, Hurtado impersonated a money launderer in Colombia and provided information regarding drug money in the United States to USCS officials and to Bonnie Klapper, an Assistant United States Attorney ("AUSA") in New York. Id. at ¶¶15, 25. Hurtado "direct[ed] the individuals with whom she contracted to deliver money to individuals who were in fact undercover agents." Id. at ¶ 25. Once the drug proceeds were delivered, the United States opened investigations into the individuals who delivered the money. Id.

The El Dorado Task Force and the Department of Justice Forfeiture Fund paid Hurtado a percentage of the dollars delivered to the undercover agents as well as a percentage of any other dollars seized during the investigation in which she served as a confidential informant. Id. at ¶ 32. Hurtado alleges that the United States has acknowledged that her work as a confidential informant led to the investigation, prosecution, and conviction of at least three criminals. Id. at ¶ 27.

C. **The Alleged Breach of Contract**

Money laundering and some of the other activities in which Hurtado participated pursuant to her agreement with the United States are criminal offenses in Colombia. Compl. ¶ 36. During the time that Hurtado worked as a confidential informant, the U.S. government did not officially notify Colombian authorities of Hurtado's activities; nor did it request support or cooperation from the Colombian government. Compl. ¶¶ 38-39.

In 2001, Colombian authorities launched an investigation of the money laundering activities in which Hurtado had participated in connection with her service as a confidential informant. Id. at ¶ 40. On or around September 26, 2001, the Office of the Colombian Attorney General sent a letter to the United States requesting information about proceedings in the Eastern District of New York related to money laundering of funds from cocaine sales in Colombia. Id. at ¶ 41. Hurtado alleges that the information requested was to be used by the Colombian authorities to inform investigations for money laundering taking place in Colombia in which

3

Hurtado was identified as a suspect. Id. at ¶ 41. According to Hurtado, this letter placed the United States on notice that Colombian authorities were investigating money laundering activities in which she had participated as a confidential informant. Id. at ¶ 42.

On or around July 31, 2003, Colombian authorities took Hurtado into custody on charges of money laundering. Compl. ¶ 43. On November 25, 2003, almost four months later, Carmen D. Colon, judicial attaché of the U.S. Embassy in Colombia, sent a letter to the Colombian Attorney General stating that Hurtado had been an active informant for the Money Laundering Unit of USCS in relation to the facts referenced in the charges brought against her in Colombia. Compl. ¶ 46. The Colombian judge in charge of Hurtado's case notified the U.S. Embassy in Colombia that the letter could not be accepted as exculpatory evidence for Hurtado unless it was ratified in court. Id. at ¶¶ 46-47. The Judge asked Colon to come to the court to ratify the content of her letter; alternatively, he offered to personally go to the U.S. Embassy in order to obtain Colon's ratification. Id. at ¶ 47. On May 15, 2004, Colon sent another unratified letter to the judge with the same information contained in her earlier letter. Id. at ¶ 48.

On February 22, 2005, the Colombian Ministry of Foreign Affairs sent a written communication to the U.S. Embassy in Colombia requesting that Colon be authorized to provide testimony in Hurtado's criminal proceedings. Id. at ¶ 49. The United States did not respond to this communication. The Ministry of Foreign Affairs repeated this request three more times. These communications were dated June 1, 2005; July 26, 2005; and December 9, 2005. Id. at ¶ 50. The United States again did not respond. Id. On June 21, 2005, the Colombian judge presiding in the criminal case issued Letter Rogatory No. JE-243, addressed to U.S. authorities in the United States, requesting information about Hurtado's role as a confidential informant. Id. at ¶ 51. With no immediate response to the Letter Rogatory, the Judge then sent a written questionnaire to Colon so that she could respond in writing on behalf of the United States. Id. at ¶ 52. Colon did not respond. Id.

Hurtado remained incarcerated during this entire period of time. On January 18, 2006, Hurtado was convicted of money laundering. Compl. ¶ 57. The Colombian Court found that Hurtado's defense that she was a confidential informant was not credible. Id. at ¶ 59. He premised his conclusion on the fact that Carmen D. Colon, judicial attaché of the U.S. Embassy in Colombia, had "refused to attend the public hearing and provided no written response to the written rogatory, requests both made through diplomatic channels, as is legal, without any further success over these past years in obtaining any other evidence requested from the government [Ms. Colon] represents." Id.

Hurtado was sentenced to ninety months in prison and ordered to pay a fine equivalent to five thousand Colombian legal minimum monthly wages.[3] Id. at ¶ 57. On August 23, 2006, after Hurtado had spent more than three years in prison, a Colombian appellate court (Superior Court of Bogota) decided to release her on probation. Id. at ¶ 60. On August 31, 2006, the appellate court confirmed Hurtado's conviction. Id.

---

[3] According to the Complaint, as of August 1, 2012, the Colombian legal minimum monthly wage was approximately 535.600 Colombian pesos, or approximately $321.36. Based on this calculation, Hurtado's fine is equivalent to approximately $1,600,800.00. Compl. ¶ 57.

4

Almost one month later, on September 26, 2006, the U.S. Department of State delivered to the Colombian Embassy in Washington, D.C. the Department of Justice's response to the June 21, 2005 Letter Rogatory No. JE-243. Compl. ¶ 62. The response included a certified statement, signed by AUSA Klapper of the Eastern District of New York, confirming that Hurtado was a confidential informant for the United States in the operation that led to her criminal investigation in Colombia. Id. It also included a copy of a check issued to Hurtado in compensation for her work as a confidential informant. Id.

Despite the response from the U.S. government, on October 24, 2007, the Supreme Court of Colombia affirmed the appellate court's decision upholding Hurtado's conviction. In so doing, it noted that the U.S. government did not respond to the letter rogatory until after Hurtado had already been convicted by the Colombian trial court and after her conviction had been confirmed by the appellate court. Id. at ¶ 64.

In 2011, Hurtado filed a new and special motion in the Supreme Court of Colombia seeking to nullify her conviction based on the U.S. government's response to Letter Rogatory No. JE-243. Id. at ¶ 65. This motion is pending before the Supreme Court of Colombia. Id.

## DISCUSSION

### I. Jurisdiction

The Court of Federal Claims has jurisdiction under the Tucker Act to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), but it does not confer any substantive rights. United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

In this case, the plaintiff is alleging breach of contract by the United States. As the court of appeals has noted, "when referencing the money-mandating inquiry for Tucker Act jurisdiction, the cases logically put to one side contract-based claims," because "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011) (quoting Sanders v. United States, 252 F.3d 1329, 1334 (Fed. Cir. 2001). "[I]n a contract case," therefore, "the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption . . . with no further inquiry being necessary." Id.; see also United States v. Winstar Corp., 518 U.S. 839, 885 (1996) (plurality opinion) (noting that "damages are always the default remedy for breach of contract").

5

The government did not challenge the court's jurisdiction by filing a motion to dismiss under RCFC 12(b)(1).  Instead, it posed such a challenge, albeit perfunctorily, in its Reply brief, where it asserted that Hurtado has "done nothing to demonstrate that the alleged contract contemplates breach damages at all" and that "[a]ccordingly, it is not the sort of contract over which this Court possess[es] jurisdiction."  Def.'s Reply 3.

In response to questions at the oral argument on its 12(b)(6) motion to dismiss, the government immediately backed away from its assertions and acknowledged the existence of Tucker Act jurisdiction over Hurtado's breach of contract claims.  Oral Arg. on Def.'s Mot. to Dismiss at 2:03:36–2:05:03.  As it is axiomatic that every court is required to satisfy itself of its own jurisdiction, even if the parties are willing to concede it, see Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986), the Court concludes that it is obligated to address the assertions made in the government's brief, notwithstanding that they have apparently now been abandoned.

Because Hurtado is alleging a breach of contract, she comes to the Court "armed with the presumption" that damages are available—a presumption that is "normally" enough to establish Tucker Act jurisdiction.  Holmes, 657 F.3d at 1314.   In this case, there is no evidence in the record to rebut this presumption.  Thus the government has not shown (or even argued) that there was an agreement between Hurtado and the United States that money damages would not be available for a breach.  To the contrary, Hurtado has plausibly alleged that the contract for her services as a confidential informant "could fairly be interpreted as contemplating money damages in the event of breach."  Holmes, 657 F.3d at 1315.   In fact, Hurtado has alleged that she suffered several economic harms as a result of the government's failure to provide her with the assistance and protection to which she claims entitlement under the alleged contract.  These include attorney's fees and the expenses of paying a fine in connection with her criminal conviction.  Hurtado's allegations, accordingly, suffice to establish this Court's jurisdiction.  St. Johns Oil Co. v. United States, 12 Cl. Ct. 139, 142 (1987) (jurisdiction established if the plaintiff alleges that it has "sustained an actual financial detriment" as a result of the government's breach of contract); see also  Jumah v. United States, 90 Fed. Cl. 603, 608-09 (2009); Aboo v. United States, 86 Fed. Cl. 618, 625 (2009); SGS-93-003 v. United States, 74 Fed. Cl. 637, 638 (2006) (exercising Tucker Act jurisdiction over breach of contract claims by confidential informants).

## II.  RCFC 12(b)(6) Failure to State a Claim

### A.  Applicable Standards

The Court turns now to the government's motion to dismiss under RCFC 12(b)(6).  In ruling on a RCFC 12(b)(6) motion to dismiss, the court accepts as true the complaint's undisputed factual allegations and construes them in the light most favorable to the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  While the court must draw all reasonable inferences in favor of the non-moving party, Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001), the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Bell Atlantic Corp.  v. Twombly, 550 U.S. 544, 555 (2007).   In other words, plaintiff's claim must be plausible on its face.  Id. at 570; Acceptance Ins. Cos., Inc. v. United States, 583

F.3d 849, 853 (Fed. Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

In order to recover for a breach of contract, plaintiff must allege: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach.  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989).  The government's motion to dismiss in this case centers on the first element of a claim for breach of contract—the existence of a valid contract.  It argues that Hurtado has failed to plausibly allege that the government agents and officials with whom she contracted possessed actual authority to obligate the United States to provide her with the assistance and protection she claims she was promised.  For the reasons set forth below, the Court concludes that the government's arguments are unpersuasive and that the factual allegations in Hurtado's complaint regarding the existence of a valid contract are sufficient "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

### B. The Complaint Contains Sufficient Factual Allegations to Support a Claim for Breach of Contract.

#### 1. Hurtado has pled sufficient facts to permit a reasonable inference that government officials promised to provide her with protection and judicial assistance in exchange for her services as a confidential informant.

A contract with the United States may be either express or implied-in-fact.  An implied-in-fact contract is one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."  Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923); see also Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996).  To establish the existence of a valid contract with the United States, whether express or implied-in-fact, a plaintiff must show (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon.  Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012); Suess v. United States, 535 F.3d 1348, 1359 (Fed. Cir. 2008); Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005).

Hurtado has pled sufficient facts to show the existence of a valid contract under either an express or implied-in-fact theory.  She alleges that in 1998 she entered a written agreement with the United States for services as a confidential informant.  Compl. ¶ 20.  She further alleges that the government has acknowledged in writing the existence of an agreement and has stated that Hurtado fulfilled her obligations under the agreement.  Id. at ¶ 28.  In addition, Hurtado alleges, she was paid a percentage of the monies seized by the government under the 1998 agreement.  Id. at ¶ 17.  These allegations are sufficient to support the mutuality of intent to contract between the parties, consideration, and lack of ambiguity in the offer and acceptance.

Further, Hurtado has pled sufficient facts to support her claim that—under the terms of the contract (whether express or implied)—the parties agreed that she would be provided with

protection and judicial assistance in connection with her work as a confidential informant. See Compl. ¶ 16 (alleging that "the parties agreed that the United States would protect plaintiff Hurtado and provide her judicial assistance in relation to the activities she would perform as a confidential informant"); see also id. at ¶ 69 ("Hurtado agreed to become a confidential informant for the United States only after she received absolute assurances that the United States would provide total protection."); ¶ 70 ("The United States' assurances of complete protection of Plaintiff Hurtado were determinative in her decision to enter into the contract to become a confidential informant.").

The government argues that it is not plausible that the agents and other government officials with whom Hurtado dealt would have (or lawfully could have) contractually obligated the United States to provide Hurtado with "complete" or "absolute" protection as alleged in her complaint. Def.'s Reply at 2, (asserting that such contention is "so extraordinary and improbable that it make [sic] her contention of authority to contract implausible"). The Court agrees with the government that it is hard to imagine that authorized government officials would have made open-ended commitments of "complete" or "absolute" protection to Ms. Hurtado. On the other hand, the Court finds it is not implausible to assume that—in exchange for her services—Hurtado may have been explicitly promised that the United States would take reasonable steps to protect her against criminal prosecution by the Colombian authorities. It is also not implausible to assume that there was a tacit understanding arising out of her course of dealing with the agents and officials on the El Dorado Task Force that such protection and assistance would be provided to her.

It bears noting that a plaintiff is not required to prove her case at the pleading stage. In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d 1323, 1339 (Fed. Cir. 2012). As noted above, Hurtado is only required to "plea[d] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Drawing all reasonable inferences in Hurtado's favor, she has made factual allegations that support her claim that she was promised protection and judicial assistance in exchange for her services as a confidential informant, thus establishing the first three elements of a valid contract: mutuality of intent, consideration, and lack of ambiguity in the offer and acceptance.

> **2. Hurtado has pled sufficient facts to permit a reasonable inference that the government officials with whom she dealt had actual authority to commit the United States to provide her with judicial assistance and protection.**

The crux of the government's motion to dismiss is addressed to the fourth element required to establish a valid contract with the government: the existence of actual authority to bind the United States to provide Hurtado with assistance and protection against investigation, prosecution and incarceration by Colombian authorities. Hurtado clearly alleges in her complaint that she dealt with officials with such authority. Compl. ¶ 78 (offer of contract in 1998 made "through agents with authority to bind the United States"); see also id. at ¶ 24 (asserting that the United States has acknowledged in a certified statement that Hurtado worked as a confidential informant "with the consent and approval of the United States Attorney's Office for the Eastern District of New York"). The government contends, however, that none of the

government officials with whom Hurtado worked could have had actual authority to obligate the United States to provide her with assistance and protection against criminal prosecution because a decision by the United States about whether to "intervene in foreign litigation . . . involves a matter committed by statute exclusively to the discretion of the Attorney General." Def.'s Mot. to Dismiss at 1, 4-5 (citing 28 U.S.C. § 516).

It is well-established that a government official's authority to bind the United States in contract may be express or implied. H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989); Cruz-Pagan v. United States, 35 Fed. Cl. 59, 60-61 (1996). Government officials have express actual authority to bind the government in contract when such authority is unambiguously granted by the Constitution, a regulation, or a statute. Jumah, 90 Fed. Cl. at 612, aff'd, 385 F. App'x. 987); Confidential Informant v. United States, 46 Fed. Cl. 1, 7 (2000); Roy v. United States, 38 Fed. Cl. 184, 188 (1997);   see City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) ("[T]he issue is not whether some authority exists that prohibits [the agent] from obligating the Government in contract; rather, the issue is whether [the agent] had been granted the authority to affirmatively obligate the Government."). Absent such express authority, a government official may nonetheless be found to have implied actual authority to bind the government "when such authority is considered to be an integral part of the duties assigned to a government employee." H. Landau & Co., 886 F.2d at 324 (quoting Cibinic & Nash, Formation of Government Contracts 43 (1982)); see also Leonardo v. United States, 63 Fed. Cl. 552, 557 (2005), aff'd, 163 F. App'x 880 (Fed. Cir. 2006); Doe v. United States, 58 Fed. Cl. 479, 485 (2003); Roy, 38 Fed.Cl. at 189, 190 n. 18. This test is met when an employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees. See H. Landau & Co., 886 F.2d at 324; Leonardo, 63 Fed. Cl. at 557 (citing Flexfab, L.L.C., 62 Fed. Cl. at 148); Cruz–Pagan, 35 Fed. Cl. at 63 (stating that contracting authority must be "necessary or essential" to carrying out those assigned duties to be "integral").

It is readily apparent that a determination of whether the test of express or implied actual authority has been met here will depend upon the identity of the individuals with whom Hurtado dealt, their duties, and other facts that are at present undeveloped (such as the extent to which promises made by lower-level agents were ratified by higher-level government officials).[4] At this stage, it is certainly entirely plausible to assume that in order to enlist the assistance and cooperation of confidential informants, it might be necessary for at least some members of the El Dorado Task Force (which apparently included prosecutors in the U.S. Attorney's office) to possess the authority to commit the government to take reasonable steps to protect such informants from suffering criminal penalties as a result of their services to the United States.

The Federal Circuit's ruling in Sommers Oil is instructive in this context. In that case, the court of appeals held that when pleading the existence of actual authority to contract, a confidential informant like Hurtado is not required "to identify and plead the particular person

---

[4] See Janowsky v. United States, 133 F.3d 888, 891 (1998) (Court of Federal Claims erred in dismissing breach of contract action brought by business owners who had acted as FBI informants without considering whether higher-level FBI officials had ratified agreement by allowing a sting operation to continue and receiving the benefits from it).

who approved the contractual arrangement . . . and the particular statute or regulation that authorized the government to commit the government in contract." 241 F.3d at 1380.  As the court of appeals observed, "persons who cooperate in criminal investigations typically deal with the investigating agents and not their superiors, and may often be unaware of what level of authority is required to commit the government to contractual undertakings." Id. at 1380-81.  Thus,

> while it is true that such cooperating witnesses may be taking the risk that their arrangements with the government will not be enforceable if the arrangements turn out not to be authorized at the appropriate level with the government, that does not justify holding that they cannot survive a motion to dismiss unless they know what government official actually authorized the arrangement and what regulatory or statutory provision authorized that official to do so.

Id. at 1381.  Therefore, "it [is] sufficient for the complaint to allege that the government's promise was authorized by a person having the legal authority to do so." Id. at 1380.

The Government's contention that—as a matter of law—28 U.S.C. § 516 precluded the El Dorado Task Force's agents and officials from entering a contractual obligation to protect Hurtado is similarly unpersuasive particularly at this stage in the case.  Section 516 states that "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."  Given this provision, the government argues,  the officials with whom Hurtado dealt could not have possessed the authority to obligate the United States to provide her with the protection and assistance she claims she was promised, which the government characterizes as an obligation to "intervene to assist her in foreign litigation."  Def.'s Reply 1.

The government's reliance on 28 U.S.C. § 516 is misplaced.  First, as Hurtado points out, her claim does not stand or fall on whether or not the agents and officials with whom she dealt possessed the authority to commit to "intervene to assist her in foreign litigation." Pl.'s Resp. 4.  Her allegation is that the government had a duty to assist and protect her well before the Colombian Government initiated its criminal prosecution, and that it breached that duty because it did not inform the Colombian authorities that she was acting on behalf of the United States either before or after the Colombian authorities began their own criminal investigation.  Id. at 4-5.  The government has not contended that the Attorney General's involvement was required by law in order to give her this sort of assistance; its argument seems to pertain only to whether section 516 reserves to the Department of Justice the authority to act on behalf of the United States once a matter is in litigation.

Second, even if only officers of the Department of Justice had the legal authority to agree to assist Hurtado either before or after the Colombian authorities initiated criminal charges against her in court, Hurtado has alleged that she met with representatives of the U.S. Attorney's office at the time she agreed to become a confidential informant and that the entire operation was under the supervision of that office.  Compl. ¶¶ 11-14.  In fact, it was ultimately Bonnie Klapper, the AUSA with whom Hurtado alleges she worked as confidential informant, who signed the

statement certifying Hurtado's role that was finally submitted to the Colombian court.  Id. at ¶ 14.  AUSAs are, of course, appointed and subject to removal by the Attorney General.  28 U.S.C. § 542.  To the extent that the U.S. Attorney's office may have signed off on or ratified promises made by the agents with whom Hurtado worked more routinely, the government's citation of 28 U.S.C. § 516 may well turn out to be beside the point.

In short, accepting the plaintiff's allegations as true (and finding them facially plausible) the Court is unwilling—at this stage in the case—to hold that 28 U.S.C. § 516 would stand as a legal impediment to the establishment of a valid contractual undertaking in this case.  The government will have ample opportunity to raise the issue of actual authority again, once the record is developed, either on summary judgment or at trial.  Cf. Sommers Oil, 241 F.3d at 1380 (distinguishing the plaintiff's burden after discovery, on summary judgment, to prove the existence of actual authority, from the plaintiff's burden where a motion to dismiss is filed based on the pleadings, with no opportunity for factual inquiry).

## CONCLUSION

On the basis of the foregoing, the government's motion to dismiss is DENIED.  Defendant, accordingly, shall file an answer to plaintiff's complaint by Wednesday, February 26, 2014.

**IT IS SO ORDERED.**

s/Elaine D. Kaplan
ELAINE D. KAPLAN
Judge, U.S. Court of Federal Claims
